# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2025-CA-00417-COA

| | |
|---|---|
| IN THE MATTER OF THE ESTATE OF LANDON MANYFIELD, DECEASED, BY CHRISHUN MANYFIELD: OGDEN AND ASSOCIATES, PLLC | APPELLANT |

v.

| | |
|---|---|
| DENNIS C. SWEET, III, P.A. D/B/A SWEET & ASSOCIATES | APPELLEE |

| | |
|---|---|
| DATE OF JUDGMENT: | 10/01/2024 |
| TRIAL JUDGE: | HON. JOSEPH PRESTON DURR |
| COURT FROM WHICH APPEALED: | COPIAH COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | JAMES ASHLEY OGDEN |
| ATTORNEY FOR APPELLEE: | DENNIS C. SWEET III |
| NATURE OF THE CASE: | CIVIL - CONTRACT |
| DISPOSITION: | REVERSED AND REMANDED - 07/21/2026 |
| MOTION FOR REHEARING FILED: | |

**BEFORE LAWRENCE, P.J., McCARTY AND EMFINGER, JJ.**

**LAWRENCE, P.J., FOR THE COURT:**

¶1.    Following the tragic near-drowning incident of Landon Manyfield in the swimming pool at a daycare, his mother, Chrishun Manyfield, hired James Ashley Ogden to initiate a negligence lawsuit in circuit court on behalf of her son.  Over the next few months, however, Manyfield became "dissatisfied" with Ogden's services and sought a new attorney, Dennis C. Sweet.  Shortly after hiring Sweet, Manyfield's son passed away, and Sweet filed a wrongful death lawsuit against the daycare.  Several months later, the daycare and its associated entities agreed to a settlement offer.  Ogden filed a lien for attorney's fees in chancery court and claimed that he had negotiated a large portion of the settlement before

Sweet was involved. The chancery court found that Ogden failed to prove he was entitled to attorney's fees and awarded all attorney's fees to Sweet. Aggrieved, Ogden appeals. Upon review, this Court reverses and remands the chancery court's decision.

## FACTUAL BACKGROUND

¶2.     On October 21, 2022, Landon Manyfield (Landon) nearly drowned at the Little Blessings from Heaven Childcare Center and Christian Academy Inc. ("Little Blessings") daycare. Landon had to be placed on life support. His mother, Chrishun Manyfield ("Manyfield"), hired Ogden & Associates PLLC ("Ogden") on October 26, 2022, to pursue legal action against Little Blessings. Ogden filed a negligence complaint in the Hinds County Circuit Court on November 11, 2022, against Little Blessings as well as Vadha LLC (the owner of the daycare), Sputnik Pools & Spa (the pool maintenance company), and John Does 1-5 (those who "may have negligently acted to a contributing cause to the injuries" of Landon). Ogden agreed to not require the defendants to file an answer immediately, and he began working on the case.

¶3.     On January 17, 2023, Manyfield informed Ogden in writing that she wished to "terminate [their] current legal relationship immediately." Two days later, Manyfield signed a contingency-fee agreement with her newly chosen counsel, Sweet & Associates ("Sweet"). On February 3, 2023, Ogden filed a notice of lien for attorney's fees on any award or settlement in the case in the Hinds County Circuit Court. On February 24, 2023, the Copiah County Chancery Court entered an order authorizing Manyfield's employment of Sweet & Associates and approving her contingency-fee contract with Sweet & Associates.

2

¶4.     Landon passed away on April 28, 2023, due to his injuries sustained at Little Blessings. Manyfield, through Sweet, dismissed her negligence complaint that had been filed by Ogden.  By and through Sweet, Manyfield filed a wrongful death suit on May 9, 2023, in the Hinds County Circuit Court.  On June 9, 2023, Manyfield filed a petition for appointment of an administrator and issuance of letters of administration of Landon's estate, petition for authority to employ attorneys and an approval of a contingency-fee contract, and petition to determine and adjudicate Landon's statutory heirs-at-law[1] in the Copiah County Chancery Court.  Manyfield's requests were granted on June 23, 2023.

¶5.     Ogden filed a second notice of attorney lien in the Copiah County Chancery Court on August 7, 2023.  On August 21, 2023, Sweet filed a complaint for a declaratory judgment against Ogden in the Hinds County Chancery Court, also requesting a temporary restraining order and a preliminary injunction to allow Manyfield's case to proceed without interference. On October 4, 2023, Ogden filed a motion to intervene in the case, arguing (1) that it had "a direct interest in the property (i.e., the settlement proceeds) that is ultimately a subject of this action and is so situated that resolution of this action in its absence may impair or impede its ability to protect its interest," and (2) that it was entitled to "reimbursement of its attorney fees and expenses from any recovery" reached.  On the same day, Ogden also filed an official complaint for intervention.[2]  On November 21, 2023, Manyfield filed a motion for summary

---

[1]  Manyfield filed an amended petition to determine the heirs-at-law on April 26, 2024.  That petition was granted on July 26, 2024.

[2]  The record indicates that oral arguments were heard on the motion, but transcripts of such proceedings are not included in the record on appeal.

judgment seeking to bar Ogden from receiving any proceeds generated by the settlement.

¶6.     On January 29, 2024, the circuit court entered an order allowing Ogden's intervention "for the limited purpose of protecting its[] interest" related to the attorney's fee lien. On January 31, 2024, Ogden filed another notice of lien for attorney's fees in the case, recounting in further detail:

> Ogden & Associates, PLLC investigated the case and entered into discovery with the defendants. The firm also entered into settlement negotiations with Defendant Little Blessings and its counsel. Due to Ogden & Associates, PLLC's work on the case, Defendant Little Blessings tendered its policy limits of one million dollars to [Manyfield] by Little Blessings on January 11, 2023. After the settlement offer was offered from Defendant Little Blessings, Ogden requested that the offer be held so that Ogden could locate and resolve the claims with the other pending defendants. While Ogden was in this process, someone convinced [Manyfield] to change counsel.

On February 1, 2024, Ogden filed a motion for approval of the attorney lien, attorney's fees, and attorney contract in the Copiah County Chancery Court.

¶7.     A hearing on these motions was conducted by the chancery court on July 8, 2024.[3] Ogden first called Chasity Thompson to testify. Thompson was employed as the office manager and a paralegal at Ogden's office. She testified that once Manyfield signed the representation contract, the office "investigated to find out all the parties that we knew of, and we put the complaint together and filed the complaint." From there, summonses were delivered to Little Blessings, Vadha, and Sputnik. Thompson testified that they became aware of video footage recorded on the day of Landon's incident, and once Manyfield signed the contract, the office requested the video. She continued, "once we got the video, we called

---

[3] The parties entered into an agreed order on July 3, 2024, limiting themselves to forty-five minutes each and calling no more than two witnesses each.

4

Ms. Manyfield to set up a time for her to come in and watch the video." Ogden then had the following exchanges with Thompson discussing the million-dollar settlement offer:

**[OGDEN]:**      Who is the defense attorney for Little Blessings that was talking to us about money offers?

**[THOMPSON]:**      Clarence Webster.

**[OGDEN]:**      Okay. **And did at any time you participate in a conversation by phone where you heard what he was saying he had as available for an offer?**

**[THOMPSON]:**      Yes.

. . . .

**[OGDEN]:**      All right. And how did I have the phone prepared so that you could hear what he was saying so I could take notes?

**[THOMPSON]:**      Speakerphone.

**[OGDEN]:**      Okay. And he said that who was offering how much?

**[THOMPSON]:**      **He said that the insurance company for Little Blessings was offering their million.**

. . . .

**[OGDEN]:**      [C]an you tell the [c]ourt whether or not [Manyfield] was informed about the understanding that there was a million dollars out there?

**[THOMPSON]:**      Yes.

**[OGDEN]:**      And what was her understanding or - - strike that. **What did she say to the office in regards to us moving forward with the million dollars?**

**[THOMPSON]:**      **She understood it and she said go forward to see what else we could get other than the million.**

| **[OGDEN]:** | Now, did our office reach out to defense counsel and tell them that we would be willing to take the million but there was more money that we needed to look into with the other defendants? |
|---|---|
| **[THOMPSON]:** | Yes. |

(Emphasis added).

¶8.     Manyfield also testified at the hearing.  She stated that she was not pleased with Ogden's methods of working the case and "had to let him go."  Members of Manyfield's family made her aware of Sweet, and she hired him.  When asked about the mediation and settlement, Manyfield testified:

| **[SWEET]:** | Is that a copy of the mediation agreement? Is that your signature on that agreement? |
|---|---|
| **[MANYFIELD]:** | Yes. |
| **[SWEET]:** | And that was done in Robert Gibbs' office? |
| **[MANYFIELD]:** | Yes. |
| **[SWEET]:** | Did you agree to the settlement then? |
| **[MANYFIELD]:** | Yes. |
| **[SWEET]:** | Did you agree to anything about a settlement before that? |
| **[MANYFIELD]:** | No. No. |

On July 8, 2024, the chancellor entered an order reserving ruling on the matter "until such time as the parties have completed mediation."  In tandem, the chancellor entered an order requiring mediation between the parties.  The mediation attempt was unsuccessful.

¶9.     On October 1, 2024, the chancery court entered an order denying Ogden's motion to

approve his lien for attorney's fees. The court's final judgment included the following language:

> The [c]ourt is **unable to ascertain what the total amount of the settlement was at the time of Ogden's representation**; or if a settlement offer existed at all during Ogden's representation. There was **no testimony or other evidence regarding a one million dollar settlement offer other than an allegation by Ogden.** There was no testimony or other evidence regarding a one million dollar settlement offer other than an allegation by Ogden. . . . The [c]ourt would have found it beneficial to elicit testimony from a witness with personal knowledge of the alleged one million dollar settlement offer, but no such witness was called to testify. . . . [T]he [c]ourt could have benefitted from **any documentation evidencing a settlement between Ogden and counsel for the defense; however, nothing was provided**. Ogden only stated that he had spoken on the phone with the defense counsel and secured a settlement for one million dollars. **This statement, made by Ogden as Counsel, was not subject to cross-examination.**

(Emphasis added).

¶10. Ogden filed a motion to reconsider on October 10, 2024. Attached to the motion was an e-mail Ogden sent to Clarence Webster, Little Blessings' counsel, on January 11, 2023, confirming the settlement offer. The e-mail read in part:

> Clarence,
>
> In regards to our phone conversation yesterday afternoon-
> You have offered to tender your client's, Little Blessings, liability policy limits of one million dollars. I will have to request my client to accept this offer but can not do so at this time as we have unresolved issues with other defendants. Once the other issues with the other defendants are resolved we can look at a global settlement.

On October 11, 2024, Ogden filed a motion to withhold the disputed attorney's fees from disbursement until the claims were resolved. On December 11, 2024, Sweet filed a motion to quash Webster's subpoena and strike his testimony from the upcoming hearing. The court

7

conducted a hearing on the motion to reconsider, the motion to withhold the disputed attorney's fees, and the motions regarding Webster on December 13, 2024. Ogden began by asking to make a proffer of Webster's testimony for purposes of a future appeal. Essentially, Webster proffered that he had indeed made a settlement offer of one million dollars to Ogden. No ruling was made by the court that day.

¶11. On March 31, 2025, the court held an additional hearing on Ogden's motion to withhold attorney's fees and Manyfield's petition for authority to employ attorneys and to have the contingency-fee contract approved. Manyfield testified at length about the circumstances of her filing of the lawsuits, her recollection of the representation of both lawyers, and the timeline of events. Ogden called Sweet to testify, and Sweet later called Ogden to testify. Both attorneys essentially presented their arguments for their respective entitlement to the settlement proceeds, highlighting again the timeline of events and conversations with the defendants. The court took the matters discussed at this hearing under advisement.

¶12. On April 3, 2025, the court denied Ogden's motion for reconsideration of the court's denial of his request for a portion of the attorney's fees. On the same day, the court granted Ogden's motion to withhold the disputed attorney's fees from disbursement. On April 15, 2025, the court granted Manyfield's petition for authority to employ Sweet and for approval of the contingency-fee contract. On April 16, 2025, Ogden appealed the denial of his motion for reconsideration.[4]

---

[4] Sweet, on Manyfield's behalf, filed a petition for court approval of the wrongful death settlement on April 25, 2025, after Ogden appealed.

**STANDARD OF REVIEW**

¶13.   "The trial court's decision on whether to award attorneys' fees, the reasonableness of the attorneys' fees, and the amount awarded is subject to an abuse of discretion standard of review." *City of Gulfport v. Cowan Rd. & HWY 90 LLC*, 352 So. 3d 592, 598 (¶18) (Miss. 2022) (citing *Miss. Power & Light Co. v. Cook*, 832 So. 2d 474, 478 (¶7) (Miss. 2002)). "A trial court's decision regarding attorneys' fees will not be disturbed by an appellate court unless it is manifestly wrong." *Id.* (quoting *Tupelo Redevelopment Agency v. Gray Corp.*, 972 So. 2d 495, 521 (¶81) (Miss. 2007)).

**DISCUSSION**

¶14.   On appeal, the issue before this Court is whether the chancellor's decision to deny Ogden's attorney's fee lien was an abuse of discretion.

¶15.   This Court first addresses the validity of the contract between Ogden and Manyfield executed in 2022. Sweet asserts that the contract is invalid because Ogden failed to procure approval from the chancery court. He cites Mississippi Uniform Chancery Court Rule 6.13:

> (A)   Every petition by a fiduciary or attorney for the allowance of attorney's fees for services rendered shall set forth the same facts as required in Rule 6.12, when touching compensation, and if so, the nature and effect thereof.
>
> (B)   If the petition be for the allowance of fees for recovering damages for wrongful death or injury, or other claim due the estate, the petition shall show the total amount recovered, the nature and extent of the service rendered and expense incurred by the attorney, and the amount if any, offered in compromise before the attorney was employed in the matter.
>
> (C)   In such cases, the amount allowed as attorney's fees will be fixed by the chancellor at such sum as will be reasonable compensation for the service rendered and expense incurred without being bound by any contract made with any unauthorized persons.
>
> (D)   If the parties make an agreement for a contingent fee, the contract or

agreement of the fiduciary with the attorney must be approved by the chancellor. Fees on structured settlements shall be based on the "present cash value" of the claim.

UCCR 6.13. Sweet is indeed correct that Ogden's contract should have been approved by the chancery court as it was a contingency-fee contract for a minor. *See Foster v. Kotsakos*, 147 So. 3d 896, 898 (¶8) (Miss. Ct. App. 2014) ("[C]ontracts regarding recovery for personal injury to minors are governed by Rule 6.12 of the Uniform Chancery Court Rules," which "requires court approval of attorney's-fee contracts and trumps the general contract law[.]").[5] It should be noted that this rule does not prescribe a time period for which the contract must be approved. The rule does not mandate any such approval prior to settlement negotiations. Certainly, the contract has to be approved at some point during the litigation process, but nothing compels its approval at any particular time, and nothing in the rule voids the contract for failure to have it approved in a defined time period. We find Sweet's argument that Ogden's contract was void for failure to obtain approval by the chancery court prior to settlement negotiations to be without merit.

¶16.    Further, "an attorney who has not had a contract approved" may still be able to be awarded attorney's fees "**on a quantum meruit basis** if the attorney has a reasonable expectation of recovery on that basis." *Bailey Law PLLC v. Morgan & Morgan PLLC (In re Bourne)*, 282 So. 3d 796, 804 (¶26) (Miss. Ct. App. 2019) (emphasis added) (quoting *Foster*, 147 So. 3d at 898 (¶¶8-9); *In re Wilhite*, 121 So. 3d 301, 305 (¶¶9-11) (Miss. Ct.

---

[5] The Mississippi Supreme Court revised the numbering in Part Six of the Uniform Chancery Court Rules in 2024, resulting in prior cases citing former Rule 6.12, which is now 6.13.

App. 2013)). "Quantum meruit recovery is a contract remedy which may be premised either on express or implied contract, and a prerequisite to establishing grounds for quantum meruit recovery is the **claimant's reasonable expectation of compensation**." *Williams v. Ellis*, 176 So. 3d 133, 138 (¶12) (Miss. Ct. App. 2015) (emphasis added) (quoting *In re Wilhite*, 121 So. 3d at 305 (¶8)). "The essential elements of recovery under quantum meruit are [']( 1) valuable services were rendered or materials furnished; (2) for the person sought to be charged; (3) which services and materials were accepted by the person sought to be charged, used and enjoyed by him; and (4) under such circumstances as reasonably notified person sought to be charged that plaintiff, in performing such services, was expected to be paid by person sought to be charged.[']" *In re Est. of Fitzner*, 881 So. 2d 164, 173-74 (¶25) (Miss. 2003) (citing *Reed v. Weathers Refrigeration & Air Conditioning Inc.*, 759 So. 2d 521, 525 (¶14) (Miss. Ct. App. 2000) (quoting Black's Law Dictionary 1243 (6th ed. 1990))).

¶17.    When discussing the attorney's fees in his order, the chancellor concluded:

> Ogden seeks an award of attorney fees and expenses for work performed in the first cause related to the settlement amount procured from Little Blessings. However, the [c]ourt was presented no way to quantify the work alleged. Ogden failed to produce an attorney fee statement or any documentation of his reasonable hourly rate. The [c]ourt is unable to ascertain what the total amount of the settlement was at the time of Ogden's representation. **There was no testimony or other evidence regarding a one million dollar settlement offer other than an allegation by Ogden**. . . . It is undisputed that Ogden performed services for [Manyfield], but all the [c]ourt could presume and base an award of attorney fees on is a reasonable sum for the following services: initial consultation, drafting and filing of pleadings prior to February 8, 2023, issuance and service of process, issuance of discovery and phone conversations for settlement negotiation. . . . The [c]ourt would have found it **beneficial to elicit testimony from a witness with personal knowledge of the alleged one million dollar settlement offer, but no such witness was called to testify**. . . . Ogden only stated that he had spoken on the phone with the defense

11

counsel and secured a settlement for one million dollars. **This statement, made by Ogden as Counsel, was not subject to cross-examination.**

(Emphasis added). Because each element is dispositive, the chancellor appears to have stopped at the first element of quantum meruit—that "**valuable** services were rendered or materials furnished[.]" *Est. of Fitzner*, 881 So. 2d at 173 (¶25) (emphasis added). The chancellor clearly found services were rendered but appeared to conclude that there was no proof as to the actual "value" of those services.

¶18. When conducting an abuse of discretion review, we "will not disturb the factual findings of a chancellor when supported by substantial evidence unless we can say with reasonable certainty that the chancellor abused his discretion, was manifestly wrong, clearly erroneous or applied an erroneous legal standard." *Ruff v. Est. of Ruff*, 989 So. 2d 366, 369 (¶11) (Miss. 2008) (quoting *Biglane v. Under the Hill Corp.*, 949 So. 2d 9, 13-14 (¶17) (Miss. 2007)). In the matter before us, we find clear errors in the chancellor's order. The chancellor did not find plainly that Ogden's evidence was insufficient; rather, the chancellor found that Ogden presented "no testimony or other evidence" at all. That is not accurate. There was evidence of the valuable services Ogden rendered for Manyfield.

¶19. First, there was certainly testimony regarding the settlement offer: Thompson heard the offer over the phone and recounted exactly what was said. For instance,

> **[OGDEN]:** All right. And how did I have the phone prepared so that you could hear what he was saying so I could take notes?
>
> **[THOMPSON]:** Speakerphone.
>
> **[OGDEN]:** Okay. And he said that who was offering how much?

**[THOMPSON]:** He said that the insurance company for Little Blessings was offering their million.

This was not just an argumentative assertion made by Ogden as counsel. Thompson was subject to cross-examination and **was** cross-examined. The chancellor's determination that a "witness with personal knowledge of the alleged one million dollar settlement offer" would have been helpful "but no such witness was called to testify" is erroneous for the same reason. Further, Manyfield agreed at the hearing on the motion to reconsider that such an offer had been made before she fired Ogden:

**[OGDEN]:** You understand that all the work that was done after Mr. Sweet got on the case with chancery court or the motions and stuff that he was fighting Vadha for, all that occurred after I received an offer for a million dollars in January of 2023 from Little Blessings, correct?

**[MANYFIELD]:** Correct.

**[OGDEN]:** Thank you.

¶20.    Secondly, the chancellor found as a factual matter that "Ogden performed services for [Manyfield], but all the [c]ourt could presume and base an award of attorney fees on is a reasonable sum for the following services: initial consultation, drafting and filing of pleadings prior to February 8, 2023, issuance and service of process, issuance of discovery and phone conversations for settlement negotiation." The filing of a complaint, putting defendants on notice of the lawsuit being brought against them, and most importantly here, settlement negotiations are all valuable services that merit compensation. There were other actions by Ogden, also clearly proven, that certainly advanced the litigation and provided value and benefit to Manyfield. Ogden procured and preserved the video of Landon's

13

drowning. This contributed to the settlement negotiations and advanced and benefitted the litigation to an ultimate settlement. Ogden certainly had telephone conversations with attorneys for the daycare discussing potential settlements and the amount of insurance available. Those actions were essential and instrumental in moving Manyfield's case forward. All of those actions added value and benefit to the case as a whole. Further, Ogden asserts that he received a settlement offer of one million dollars from Little Blessings. Such an assertion, with the evidence Ogden provided, should have been considered in the chancellor's determination.

¶21. Finally, the absence of a timesheet or hours log from Ogden should not automatically bar him from recovery, especially when a contingency-fee contract was signed by the client. Contingency-fee contracts have been held as reasonable attorney fees in the past.[6] The nature of plaintiff attorneys' work is not one where hours are typically logged. The work put into a case is more than a tally of hours. The work put into a case is about a lawyer's efforts adding value and benefit to moving the case forward. A closer consideration of the evidence put forth by Ogden and the value of the work he put into the case is necessary.

¶22. Should the chancellor find that Ogden's claim meets all four elements of the quantum meruit analysis, he should then determine a reasonable amount of attorney fees utilizing the factors set out in Rule 1.5 of the Mississippi Rules of Professional Conduct and *McKee v.*

---

[6] *See U. Servs. Auto Ass'n v. Est. of Minor*, 418 So. 3d 1173, 1191 (¶60) (Miss. 2024) (awarding attorney's fees under a contingency fee contract); *see also In re Est. of Gillies*, 830 So. 2d 640, 650-51 (¶45) (Miss. 2002) (McRae, P.J., dissenting) ("[q]uantum mer[u]it can also be on a basis of percentage, because as oftentimes, lawyers will take a contingency fee contract and not keep up with their hours." (citing *Tyson v. Moore*, 613 So. 2d 817 (Miss. 1992))).

*McKee*, 418 So. 2d 764 (Miss. 1982). Rule 1.5 requires a lawyer's fee to be reasonable and offers the following factors to assist in such a determination:

(1)    the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;
(2)    the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;
(3)    the fee customarily charged in the locality for similar legal services;
(4)    the amount involved and the results obtained;
(5)    the time limitations imposed by the client or by the circumstances;
(6)    the nature and length of the professional relationship with the client;
(7)    the experience, reputation, and ability of the lawyer or lawyers performing the services; and
(8)    whether the fee is fixed or contingent.

Miss. R. Prof. Conduct 1.5(a)(1)-(8). These factors are integrally related to the *McKee* analysis, our state's specific caselaw on attorney's fees, typically utilized in domestic disputes.

¶23.    The *McKee* factors, while similar but not identical, are,

in addition to the relative financial ability of the parties, the skill and standing of the attorney employed, the nature of the case and novelty and difficulty of the questions at issue, as well as the degree of responsibility involved in the management of the cause, the time and labor required, the usual and customary charge in the community, and the preclusion of other employment by the attorney due to the acceptance of the case.

*McKee*, 418 So. 2d at 767.

¶24.    This Court dealt with a similar matter in *In re Bourne*, 282 So. 3d at 796 (¶1). Following the death of her mother, Bourne hired Morgan & Morgan to initiate a wrongful-death lawsuit in 2011. *Id.* at 799 (¶2). The firm worked the case for approximately five years, and three different attorneys were assigned to the case. *Id.* at (¶3). "In the nearly five years that it had the case, Morgan & Morgan had only obtained medical records, identified

witnesses and parties, filed the lawsuit, exchanged written discovery and participated in four depositions. . . ." *Id.* at 800 (¶8). In 2016, Bourne hired Chynee Bailey, a solo practitioner, who was able to draft a scheduling order with the defense, narrow down possible dates for trial, and, ultimately, reach a settlement at mediation. *Id.* at 800-01 (¶¶10-12). Morgan & Morgan argued that they were entitled to a larger portion of fees than Bailey. *Id.* at 801 (¶¶13-14).

¶25.    The circuit court awarded 95% of the attorney's fees to Morgan & Morgan and 5% to Bailey. *Id.* at 802-03 (¶¶18-19). Bailey appealed, arguing—among other issues—that the circuit court's apportionment of attorney's fees was erroneous. *Id.* at 803 (¶19). On appeal, this Court found that the "fee allocated to Bailey was unreasonable" and that the circuit court made "manifestly erroneous factual findings" in its decision regarding the time each firm had worked on the case and what that work meant for both firms. *Id.* at 805, 807 (¶¶28, 36). Bailey negotiated the settlement and completed estate work to ensure the payment could be made. *Id.* at 808 (¶37). This Court found that "the circuit court failed to undertake the analysis required under Mississippi law and made only minimal and erroneous findings to support the award of fees in this case." *Id.* at 807 (¶35). Continuing, we held that "the circuit court abused its discretion and we reverse[d] and remand[ed] for the circuit court to undertake the appropriate *McKee* factors and Rule 1.5(e) analysis and reapportion the fees awarded to the parties." *Id.* at 808 (¶39).[7]

---

[7] In order for this Court to reverse and render a decision such as this, we must have fact-findings from the chancellor; even then we will only do so if there is "sufficient evidence" to justify same. *See Minor*, 418 So. 3d at 1191 (¶60) ("To be clear, this Court has the authority to reverse and render attorneys' fees, so long as we have sufficient evidence

¶26. Here, the maximum attorney fee was predetermined by both attorneys and set by contract at the contingency-fee rate. The manner in which that fee is split between the attorneys is the crucial factual decision to be determined by the chancellor. The information to make such a determination is present in the record, including, but not limited to, the amount of time each attorney held the reins and drove the litigation, the value of the work performed by each attorney in relation to the whole, and the benefit to the advancement of the litigation.[8] This information is all relevant for conducting a quantum meruit analysis. Further, those factors must then also be considered with the factors set forth in Mississippi Rule of Professional Conduct 1.5 and the *McKee* factors for a final determination as to how the total fee should be split in equity between the firms.[9]

## CONCLUSION

¶27. Pursuant to *In re Bourne*, we find the chancellor's decision was an abuse of discretion and "reverse and remand for the circuit court to reapportion the fees awarded to the law firms" in accordance with a quantum meruit analysis, the *McKee* factors, and the factors set out in Rule 1.5(a) of the Mississippi Rules of Professional Conduct. *See In re Bourne*, 282

_____

to make that determination." (citing *McKee*, 418 So. 2d at 767)).

[8] It is important to note that the entire time Ogden controlled the litigation, it was a negligence lawsuit. It could not become a wrongful death lawsuit until after Landon died on April 28, 2023. By that time, Ogden had been off the case since January 17, 2023.

[9] Using the factors cited here, the chancellor must determine a reasonable fee-splitting arrangement between the attorneys. For example, if the chancellor were to find Ogden is entitled to 25% of the settlement, Ogden would receive $100,000; if the chancellor were to find Ogden is entitled to 10% of the settlement, Ogden would receive $40,000. Again, this Court will not engage in fact-finding to apportion the amount of work each firm completed, as that role belongs to the chancellor.

So. 3d at 809 (¶42).

¶28.    **REVERSED AND REMANDED.**

**BARNES, C.J., CARLTON, P.J., WESTBROOKS, McCARTY, EMFINGER, WEDDLE AND LASSITTER ST. PÉ, JJ., CONCUR. WILSON, P.J., AND McDONALD, J., CONCUR IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION.**